Pen Register with Subscriber and Cell-Site Information (Rev. 4/10)
WMN:KKO
F. #2010R02094

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK



**MISC. 11 -0532**

- - - - - - - - - - - - - - - - - - x
       :

IN THE MATTER OF AN APPLICATION OF  :
THE UNITED STATES OF AMERICA FOR AN  :
ORDER AUTHORIZING (1) THE USE OF A  :    <u>SEALED APPLICATION</u>
PEN REGISTER AND A TRAP AND TRACE  :
DEVICE WITH PROSPECTIVE CELL-SITE  :
INFORMATION AND (2) THE RELEASE OF  :
HISTORICAL CELL-SITE AND SUBSCRIBER  :
INFORMATION FOR MOBILE TELEPHONES  :
ASSIGNED NUMBERS (917) 559-1687,  :
(347) 601-5083 and (917) 864-7701  :
       :

- - - - - - - - - - - - - - - - - - x

EASTERN DISTRICT OF NEW YORK, SS:

        KARIN ORENSTEIN, an Assistant United States Attorney

for the Eastern District of New York, hereby applies to the Court

for Orders authorizing a pen register and trap and trace device

with prospective cell-site information and the release of

historical cell-site and subscriber information for each of the

following three mobile telephones: (1) (917) 559-1687, a mobile

telephone serviced by T-MOBILE, USA, with International Mobile

Subscriber Identity ("IMSI") 310260250312721 subscribed to by

JAMES PASCALE, 68 Elder Avenue, Staten Island, New York (the

"PASCALE TELEPHONE"); (2) (347) 601-5083, a mobile telephone

serviced by AT&T Wireless, with IMSI 310410356751754 subscribed

to by JAMES WRENN, 83 Glover Avenue, Staten Island, New York (the

"WRENN TELEPHONE"); and (3) (917) 864-7701, a mobile telephone

serviced by Verizon Wireless, with Electronic Serial Number

("ESN") A000001C1ACF15 subscribed to by STEVEN PUNTURIERI, 14
Dorval Avenue, Staten Island, New York (the "PUNTURIERI
TELEPHONE"; collectively, the "SUBJECT TELEPHONES")  In support
of this application I state the following:

I.  Facts Supporting Application

     1.   I have discussed this matter fully with a law
enforcement officer involved in the investigation.  Based upon
that discussion, I believe and for the following reasons hereby
certify that the information likely to be obtained by the use of
a pen register and trap and trace device is relevant to an
ongoing criminal investigation as required by 18 U.S.C.
§ 3123(a).  First, the Drug Enforcement Administration (the "DEA"
or "investigative agency") is conducting a criminal investigation
into possible violations of federal criminal laws, including
narcotics offenses in violation of 21 U.S.C. §§ 841 and 846 (the
"specified offenses").  Second, it is believed that JAMES
PASCALE, JAMES WRENN, STEVEN PUNTURIERI, and others known and
unknown, have used and will continue to use the SUBJECT
TELEPHONES in furtherance of the specified offenses.  Third, pen
register and trap and trace device information will further the
investigation by helping to identify: (1) the names of suspected
suppliers, customers and other individuals who assist in the
distribution of narcotics; (2) the addresses of "stash" houses
where narcotics are stored; (3) the identity of transportation

2

sources used by drug traffickers; (4) the locations of money transfer businesses used by members of the operation to launder proceeds of drug trafficking activities or through which money is exchanged with coconspirators; (5) the identity of bank and credit card accounts used by members of the organization to obtain good and services used by it; (6) the geographic breadth of the suspected drug trafficking operation and (7) the identity of the potential organizers, leaders, managers, or supervisors of the suspected trafficking operation.

2. On November 23, 2010, the Honorable Roanne L. Mann, United States Magistrate Judge, authorized a pen register and trap and trace device with prospective cell-site information and the release of historical cell-site information for the PASCALE TELEPHONE (the "November 23, 2010 PASCALE TELEPHONE pen register"). This authorization has expired. Other than the November 23, 2010 PASCALE TELEPHONE pen register, there have been no prior requests for pen registers or cell-site information in connection with this investigation.

3. Based upon discussions with a special agent of the investigative agency, the government sets forth the following facts showing that probable cause exists to believe that information identifying the antenna tower receiving transmissions from the SUBJECT TELEPHONES at the beginning and the end of a call or text message transmission made or received by the SUBJECT

TELEPHONES, including information on what portions of those towers are receiving the transmissions ("PROSPECTIVE CELL-SITE INFORMATION"), will constitute or lead to evidence of the specified offenses, as well as help to identify individuals who are engaged in the commission of these offenses:[1]

4. This investigation has established information indicating that JAMES PASCALE is using the PASCALE TELEPHONE. According to a confidential informant ("CI #1"), who has proven reliable in the past and whose information has been corroborated by independent evidence, PASCALE uses the PASCALE TELEPHONE to receive and make telephone calls and to receive and send text messages regarding the sale of controlled substances, including the brand-name prescription drugs OxyContin and Xanax. Oxycodone, the active ingredient in OxyContin, is a Schedule II controlled substance. Alprazolam, the active ingredient in Xanax, is a Schedule IV controlled substance.

5. This investigation has further established information that JAMES WRENN uses the WRENN TELEPHONE. As

---

[1]  In presenting probable cause to support its prospective cell-site information request, the government does not concede that such cell-site records — routinely retained by wireless carriers as business records — may only be obtained via a warrant under Fed. R. Crim. P. 41. See In re Application, 632 F. Supp. 2d 202 (E.D.N.Y. 2008) (authorizing prospective acquisition of cell-site records under combined authority of 18 U.S.C. 2703(d) & 3121 et seq.); In re Application, Misc. No. 08-533 (BMC) (E.D.N.Y. Jan. 12, 2009) (same); In re Application, 460 F. Supp. 2d 448 (S.D.N.Y. 2006) (same).

4

discussed below, on October 20, 2010, PASCALE used the PASCALE TELEPHONE to exchange 28 text messages with the WRENN TELEPHONE. The majority of these text messages preceded agents' observation of WRENN arriving by car and entering PASCALE's residence. According to CI #1, WRENN supplied the 100 OxyContin 80mg tablets which PASCALE sold to CI #1.

6.     This investigation has further established information that STEVEN PUNTURIERI uses the PUNTURIERI TELEPHONE. As discussed below, on November 3, 2010, PASCALE used the PASCALE TELEPHONE to exchange six text messages with the PUNTURIERI TELEPHONE.  All of these text messages preceded agents' observation of PUNTURIERI arriving by car and entering PASCALE's residence prior to the CS's arrival to purchase 100 OxyContin 80mg tablets, consistent with PASCALE's text message to CI #1 that he was waiting for "his boy" to bring the pills.  Similarly, on December 9, 2010, PASCALE used the PASCALE TELEPHONE to exchange three text messages and two telephone calls with the PUNTURIERI TELEPHONE prior to PUNTURIERI's and CI #1's arrival at PASCALE's residence where CI #1 purchased 150 OxyContin 80mg tablets.

A.     Use of the PASCALE TELEPHONE and WRENN TELEPHONE in Furtherance of Unlawful Narcotics Activity on October 20, 2010

7.     On October 20, 2010, at approximately 4:00 p.m., CI #1 advised DEA agents, in sum and substance, that pursuant to

their instructions, he/she had negotiated a purchase from PASCALE of 100 OxyContin 80mg tablets, for $2,000 ($20 per pill) via text message to the SUBJECT TELEPHONE.

8. CI #1 advised DEA agents, in sum and substance, that during the negotiation PASCALE requested that CI #1 send a text message to the SUBJECT TELEPHONE when he/she was 45 minutes away so PASCALE could coordinate with his source to drop off the pills before CI #1 arrived.

9. On the same day, at approximately 4:30 p.m., in anticipation of a monitored narcotics purchase by CI #1 from PASCALE to take place later that day, DEA agents searched CI #1 and CI #1's vehicle for contraband and confirmed that he/she did not possess any contraband.

10. On the same day, at approximately 4:45 p.m., pursuant to DEA instructions and under observation by DEA agents, CI #1 sent a text message to PASCALE at the SUBJECT TELEPHONE to advise PASCALE that he/she was 45 minutes away. At the same time, DEA agents established surveillance in the vicinity of 68 Elder Avenue, Staten Island, New York, which is PASCAL's residence as listed in the subscriber information for the SUBJECT TELEPHONE (the "residence").

11. On the same day, at approximately 5:15 p.m., DEA agents provided CI #1 with $2,000 in U.S. currency and a digital audio recorder to record the anticipated narcotics transaction.

6

12. On the same day, at approximately 5:25 p.m., pursuant to DEA instructions and under observation by DEA agents, CI #1 sent another text message to PASCALE at the SUBJECT TELEPHONE to advise PASCALE that he/she was five minutes away.

13. On the same day, at approximately 5:30 p.m., DEA agents conducting surveillance of the residence observed a white male, subsequently identified as PASCALE, standing near the front of the residence holding a cellular telephone to his ear. At approximately the same time that PASCALE was observed using the cellular telephone, DEA agents observed that CI #1 was receiving a call from the SUBJECT TELEPHONE on CI #1's cellular telephone. DEA agents directed CI #1 to answer the call. CI #1 answered the call and advised the caller, in sum and substance, that he/she was close by. After CI #1 ended the call, DEA agents conducting surveillance of the residence observed PASCALE remove the cellular telephone from his ear. CI #1 advised agents, in sum and substance, that the person he spoke with was PASCALE.

14. On the same day, at approximately 5:31 p.m., DEA agents conducting surveillance of the residence observed a black Porsche Cayenne S (the "Porsche") driving on Elder Avenue. The Porsche parked on the street close to the residence. A white male, subsequently identified as JAMES WRENN, exited the Porsche and walked towards the residence.

7

15. On the same day, at approximately 5:35 p.m., DEA agents followed CI #1 in CI #1's vehicle to the vicinity of the residence. DEA agents observed CI #1 arrive at the residence at approximately 5:42 p.m., park his/her vehicle in the vicinity of the residence, exit the vehicle and walk toward the basement apartment of the residence. At approximately 5:43 p.m., DEA agents observed CI #1 walk from the residence back to his/her vehicle, enter the vehicle and depart the area. DEA agents followed CI #1's vehicle to a predetermined meeting location more than a mile away where CI #1 provided the agents with 100 round green pills and the digital audio recorder. DEA agents again searched CI #1 and CI #1's vehicle for additional contraband and confirmed that CI #1 did not possess any additional contraband.

16. CI #1 stated, in sum and substance, that he/she walked up to the door of the residence, entered PASCALE's apartment and observed PASCALE, a female he/she recognized as PASCALE's girlfriend and another male inside who he/she recognized from previous narcotics activity with PASCALE. CI #1 further advised DEA agents, in sum and substance, that after greetings were exchanged, CI #1 provided PASCALE with $2,000 in U.S. currency and in exchange PASCALE gave him 100 OxyContin 80mg tablets. CI #1 further advised DEA agents, in sum and substance, that PASCALE informed CI #1 that he had 120 "blues," meaning OxyContin 30mg tablets (which are blue in color) that he wanted

8

to sell to CI #1.  The CS's information is corroborated by the digital audio recording of the meeting.

17.  At approximately 5:52 p.m., DEA agents conducting surveillance of the residence observed PASCALE and WRENN exit the residence and stand next the Porsche talking.  Shortly thereafter, DEA agents observed WRENN enter the Porsche and depart the area.

18.  Toll records show that there were 28 text messages between the PASCALE TELEPHONE and the WRENN TELEPHONE on this date, including a text message at approximately 5:13 p.m., prior to CI #1's arrival at PASCALE's residence.

B.  Use of the PASCALE TELEPHONE and PUNTURIERI TELEPHONE in Furtherance of Unlawful Narcotics Activity on October 25, 2010 through November 3, 2010

19.  Beginning on October 25, 2010, pursuant to instructions from DEA agents, CI #1 negotiated the purchase of 100 OxyContin 80mg tablets from PASCALE for $2,000 in U.S. currency via telephone calls and text messages to and from the PASCALE TELEPHONE.

20.  On November 3, 2010 at approximately 4:30 p.m., DEA agents met CI #1 in preparation for the transaction.  At that time, CI #1 presented his/her cellular telephone which showed the following messages in its incoming and outgoing message logs discussing a possible additional transaction for 100 OxyContin

30mg tablets for $1,150. CI #1 explained to DEA agents, in sum and substance, that PASCALE charges him/her $11.50 per tablet.

21. On October 25, 2010, at approximately 6:32 p.m., PASCALE used the SUBJECT TELEPHONE to send a text message to CI #1's telephone. PASCALE wrote: "If u get out 2day or tomo u wana throw 1150 it that acct I grabed 100 thaught u were guna b round. If u can even move lol I know u said td is close". CI #1 explained to DEA agents, in sum and substance, that PASCALE was asking CI #1 to deposit $1,150 U.S. currency into PASCALE's girlfriend's TDBank account as prepayment for a future purchase of OxyContin to assist with a down payment for PASCALE's new car, a white Mercedes-Benz. The amount $1,150 corresponds to a quantity of 100 OxyContin 30mg tablets at $11.50 per tablet.

22. On October 25, 2010, at approximately 6:46 p.m., CI #1 responded to PASCALE's text message by sending a text message to PASCALE on the SUBJECT TELEPHONE. CI #1 wrote: "Nah dude. I have so many. I haven't moved any of anything yet. You gotta ask me first. I m gonna be good for a while. Shit is slow." CI #1 explained to DEA agents, in sum and substance, that he/she told PASCALE that he/she was not interested because he/she already had OxyContin 30mg tablets for distribution.

23. On October 25, 2010, at approximately 6:46 p.m., PASCALE responded to CI #1's text message by using the SUBJECT TELEPHONE to send a text message to CI #1. PASCALE wrote: "lte

10

leme no. Cause I'm kinda stuck cause I'm supposed 2 get a new car this week if u could help me out and grab it leme no. Jus section 100". CI #1 previously explained that "section100" corresponds to a quantity of 100 tablets. ..

24. On October 26, 2010, at approximately 9:57 p.m., PASCALE used the SUBJECT TELEPHONE to send a text message to CI #1. PASCALE wrote: "I know cuz I'll make it up to u on the nxt ones I know u do a lot for me kid and I appreciate it. Leme no if nething happens and if u could throw that in her account for me. Feel better kid".

25. On November 3, 2010, at approximately 4:30 p.m., DEA agents searched CI #1 and CI #1's vehicle for contraband with negative results. At the same time, other DEA officers established surveillance in the vicinity of PASCALE's residence.

26. On the same date, at approximately 4:47 p.m., pursuant to DEA instructions and under observation by DEA agents, CI #1 sent another text message to PASCALE at the SUBJECT TELEPHONE. CI #1 wrote: "15 mins out".

27. On the same date, at approximately 4:50 p.m., DEA agents observed PASCALE walk back and forth four times from the residence to a white Mercedes-Benz parked on Elder Avenue ("PASCALE's Mercedes") and place items in the trunk. PASCALE then returned to the residence.

28. On the same date, at approximately 5:03 p.m., CI #1 placed a consensually recorded call to PASCALE at the SUBJECT TELEPHONE. During the telephone call, CI #1 advised PASCALE, in sum and substance, that he/she was five minutes away. PASCALE stated, in sum and substance, that he was waiting for CI #1 and "his boy," who should be arriving coincident with CI #1. CI #1 advised DEA agents, in sum and substance, that he/she recognized PASCALE's voice during this conversation.

29. On the same date, following the recorded telephone conversation between CI #1 and PASCALE, DEA agents equipped CI #1 with a digital audio recording device and provided CI #1 with pre-recorded buy money to purchase OxyContin 80mg tablets. DEA agents them followed CI #1 while he/she drove his/her vehicle to the vicinity of the residence.

30. On the same date, at approximately 5:10 p.m., DEA agents observed CI #1 park his/her vehicle in the vicinity of the residence, exit his/her vehicle and walk towards PASCALE, who was then standing next to PASCALE's Mercedes. DEA agents then observed PASCALE and CI #1 walk from PASCALE's Mercedes towards the residence.

31. On the same date, at approximately 5:16 p.m., CI #1 sent a text message to DEA agents. CI #1 wrote: "waiting for boy.5 mins".

32. On the same date, at approximately 5:18 p.m., CI #1 sent a text message to DEA agents. CI #1 wrote: "Boys almost here".

33. On the same date, at approximately 5:20 p.m., DEA agents observed a silver Mercedes-Benz registered to STEVEN J. PUNTURIERI park near the residence on Elder Avenue. A male, later identified as PUNTURIERI, exited the vehicle and walked towards the residence. PASCALE, PUNTURIERI and CI #1 then exited the residence. DEA agents witnessed PUNTURIERI count cash while all three walked towards PASCALE's Mercedes.

34. On the same date, at approximately 5:22 p.m., DEA agents observed CI #1 depart in CI #1's vehicle. DEA agents followed CI #1 to a predetermined location within a few miles of PASCALE's residence where CI #1 provided the agents with 100 round green pills, identified by agents as 100 OxyContin 80mg tablets, and the digital audio recorder. DEA agents then searched CI #1 and CI #1's vehicle for contraband with negative results.

35. CI #1 then described his/her meeting with PASCALE, in sum and substance, to the DEA agents as follows. PASCALE showed CI #1 his newly leased white Mercedes-Benz after he/she arrived. CI #1 then went inside PASCALE's basement apartment and observed PASCALE's girlfriend sleeping on a couch. CI #1 provided the pre-recorded buy money to PASCALE. PASCALE informed CI #1, in

13

sum and substance, that he would give CI #1 a better price if he/she purchased larger quantities. PASCALE further advised CI #1, in sum and substance, that he has a source for gallon quantities of "GHB" and has "HGH."[2] A short time later, PASCALE and PUNTURIERI met directly outside the apartment where CI #1 observed PASCALE give PUNTURIERI money. PASCALE then handed CI #1 a bag containing the 100 round green pills. PASCALE, PUNTURIERI and CI #1 exited the residence and walked towards PASCALE's Mercedes. The agents observations and digital audio recording corroborate CI #1's description of the meeting with PASCALE and PUNTURIERI.

36. On the same date, at approximately 5:23 p.m., DEA agents observed PASCALE and PUNTURIERI enter PASCALE's Mercedes. At approximately 5:31 p.m., DEA agents observed PASCALE and PUNTURIERI exit PASCALE's Mercedes. PASCALE then returned to the residence and PUNTURIERI entered his silver Mercedes and departed. Surveillance was maintained on PUNTURIERI until he arrived at 14 Dorval Avenue, Staten Island, New York, where PUNTURIERI resides.

37. Toll records show that there were six text messages between the PASCALE TELEPHONE and the PUNTURIERI

---

[2] GHB stands for Gamma-Hydroxy-Butyrate and is a Schedule I controlled substance. HGH stands for Human Growth Hormone and is a substance that is regulated by the Food and Drug Administration.

TELEPHONE on this date prior to the controlled purchase, including a text message at approximately 5:04 p.m.

    C.    Use of the PASCALE TELEPHONE and the PUNTURIERI TELEPHONE in Furtherance of Unlawful Narcotics Activity on December 7, 2010 through December 9, 2010

    38.  Beginning on December 7, 2010, pursuant to instructions from DEA agents, CI #1 negotiated the purchase of 150 OxyContin 80mg tablets from PASCALE via text messages to and from the PASCALE TELEPHONE.

    39.  The following messages were exchanged on December 7, 2010 in furtherance of this controlled purchase and were subsequently reviewed by DEA agents on CI #1's cellular telephone.

    a.    At approximately 6:57 p.m., CI #1 sent a text message to PASCALE on the PASCALE TELEPHONE. CI #1 wrote: "Hey man. Whats good. Giants tiks section 150 for Thursday. Wouldd they be available". CI #1 previously advised agents that "Giants tickets" was PASCALE's current code for OxyContin 80mg tablets and "section" numbers referred to the number of tablets requested. Thus, CI #1 was asking PASCALE to sell him/her 150 OxyContin 80mg tablets.

    b.    At approximately 7:20 p.m., PASCALE used the PASCALE TELEPHONE to send a text message to CI #1's cellular telephone. PASCALE wrote: "150%".

15

       c.    At approximately 7:26 p.m., CI #1 sent the following text message to PASCALE on the PASCALE TELEPHONE.  CI #1 wrote:  "Ok get it set up".

       d.   At approximately 7:28 p.m., PASCALE used the PASCALE TELEPHONE to respond by text message to CI #1's telephone.  PASCALE wrote: "Def right?"

       e.    At approximately 7:26 p.m., CI #1 sent the following text message to PASCALE on the PASCALE TELEPHONE.  CI #1 wrote:  "Yea".

       f.    At approximately 7:37 p.m., PASCALE used the PASCALE TELEPHONE to respond by text message to CI #1's telephone.  PASCALE wrote: "Kk sounds good".

     40.   The following messages were exchanged on December 8, 2010 in furtherance of the same controlled purchase of 150 OxyContin 80mg tablets and were subsequently reviewed by DEA agents on CI #1's cellular telephone:

       a.   At approximately 8:34 p.m., CI #1 sent the following text message to PASCALE on the PASCALE TELEPHONE.  CI #1 wrote:  "Hey man. I just woke up. I'm going back to bed. Long day. Were still on for tomm. Around 530".

       b.   At approximately 8:35 p.m., PASCALE used the PASCALE TELEPHONE to respond by text message to CI #1's telephone.  PASCALE wrote: "Kk sounds good hit me up tomo". Thus, on December 8, 2010, PASCALE and CI #1 confirmed that they

would meet the following day at 5:30 p.m. to conduct the transaction.

41. The following messages were exchanged on December 9, 2010 in furtherance of the same controlled purchase of 150 OxyContin 80mg tablets and were subsequently reviewed by DEA agents on CI #1's cellular telephone:

a. At approximately 12:42 p.m., CI #1 sent a text message to PASCALE on the PASCALE TELEPHONE. CI #1 wrote: "Hey man. See you for 530".

b. At approximately 3:36 p.m., PASCALE used the PASCALE TELEPHONE to respond by text message to CI #1's telephone. PASCALE wrote: "Kk".

c. At approximately 3:39 p.m., CI #1 sent a text message to PASCALE on the PASCALE TELEPHONE. CI #1 wrote: "See you soon".

d. At approximately 4:00 p.m., PASCALE used the PASCALE TELEPHONE to respond by text message to CI #1's telephone. PASCALE wrote: "Kk Cool".

e. At approximately 4:21 p.m., CI #1 sent a text message to PASCALE on the PASCALE TELEPHONE. CI #1 wrote: "Should I hit u up 20 out". In this message, CI #1 was asking PASCALE whether CI #1 should contact PASCALE when he/she was 20 minutes away.

17

f.   At approximately 4:21 p.m., PASCALE used the PASCALE TELEPHONE to send a text message to CI #1's telephone while agents were monitoring CI #1's telephone.  PASCALE wrote: "Yea I'm good 2 go".

g.   At approximately 4:22 p.m., CI #1 sent a text message to PASCALE on the PASCALE TELEPHONE.  CI #1 wrote:  "Ok".

42.  On December 9, 2010 at approximately 4:42 p.m., DEA agents monitored a judicially-authorized live video pole camera near PASCALE's residence.  Agents observed the silver Mercedes-Benz registered to Steven PUNTURIERI arrive and park on Elder Avenue.  Agents observed a male, later determined to be PUNTURIERI exit the Mercedes-Benz and walk towards PASCALE's residence.  After a few minutes, PUNTURIERI returned to his vehicle while operating a cellular telephone.  PUNTURIERI and his vehicle were previously observed in connection with the controlled purchased of 100 OxyContin 80mg tablets from PASCALE conducted by CI #1 on November 3, 2010.

43.  On the same date, at approximately 4:46 p.m., DEA agents met with CI #1 in preparation for a purchase of 150 OxyContin 80mg tablets for $3,000.00 in pre-recorded buy money from PASCALE at the residence.  At approximately 5:00pm, DEA agents searched CI #1 and CI #1's vehicle for contraband with negative results.

18

44. On the same date, at approximately 5:01 p.m., pursuant to DEA instructions and under observation by DEA agents, CI #1 sent a text message to PASCALE at the SUBJECT TELEPHONE. CI #1 wrote: "I'm 20 away".

45. On the same date, at approximately 5:01 p.m., PASCALE used the PASCALE TELEPHONE to send a text message to CI #1's telephone while agents were monitoring CI #1's telephone. PASCALE wrote: "Kk".

46. On the same date, at approximately 5:23 p.m., pursuant to DEA instructions and under observation by DEA agents, CI #1 placed a digitally recorded telephone call to PASCALE at the PASCALE TELEPHONE to advise PASCALE in sum and substance, he/she was three minutes away. CI #1 reached PASCALE's voicemail but was instructed by DEA agents not to leave a message.

47. On the same date, at approximately 5:24 p.m., PASCALE used the PASCALE TELEPHONE to call CI #1's telephone and DEA agents digitally recorded the call. During the recorded call CI #1 advised PASCALE, in sum and substance, that he/she was three minutes away and PASCALE responded that CI #1 could "just come on in." CI #1 informed DEA agents, in sum and substance, that he/she recognized PASCALE's voice during the call. DEA agents then equipped CI #1 with a digital audio recording device and provided CI #1 with pre-recorded buy money for the purchase of OxyContin.

19

48. On the same date, at approximately 5:29 p.m., DEA agents followed CI #1 while CI #1 drove in his/her vehicle to the vicinity of PASCALE's residence. At approximately 5:32 p.m., DEA agents observed CI #1 park CI #1's vehicle and walk towards the residence. At approximately 5:38 p.m., DEA agents observed CI #1 return to CI #1's vehicle and depart. DEA agents followed CI #1's vehicle to a predetermined location within a few miles from PASCALE's residence where CI #1 provided agents with over 147 round green pills and the digital audio recorder. DEA agents then searched CI #1 and CI #1's vehicle for contraband with negative results.

49. CI #1 then described his/her meeting with PASCALE, in sum and substance, to the DEA agents as follows. PASCALE showed CI #1 his new hardwood floors and furniture. PASCALE mentioned the recent arrest of a doctor in Staten Island who was writing prescriptions for OxyContin while knowing the patients were providing him with false X-rays. CI #1 provided PASCALE with the pre-recorded buy money after which PASCALE told CI #1 that he removed three pills. Since neither CI #1 nor PASCALE had any change, PASCALE told CI #1 he would make up the difference on the next purchase.

50. On the same date, at approximately 5:39 p.m., DEA agents observed PASCALE exit the residence and walk to PASCALE's

20

Mercedes. Agents then observed PASCALE depart the area and drive to LA Fitness off Route 440N.

51. Toll records show that there were three text messages and two telephone calls between the PASCALE TELEPHONE and the PUNTURIERI TELEPHONE on this date prior to the controlled purchase, and one telephone call afterwards.

## II. Subscriber and Cell-Site Information Will Further This Investigation

52. I have been informed by a special agent of the investigative agency that based on that agent's training and experience, subscriber information with respect to telephone numbers identified by a pen register or trap and trace device has yielded information that was relevant and material in previous narcotics investigations. Such information includes leads relating to: (1) the names of suspected suppliers, customers and other individuals who assist in the distribution of narcotics; (2) the addresses of "stash" houses where narcotics are stored; (3) the identity of transportation sources used by drug traffickers; (4) the locations of money transfer businesses used by members of the operation to launder proceeds of drug trafficking activities or through which money is exchanged with coconspirators; (5) the identity of bank and credit card accounts used by members of the organization to obtain good and services used by it; (6) the geographic breadth of the suspected drug trafficking operation and (7) the identity of the potential

organizers, leaders, managers, or supervisors of the suspected trafficking operation.  The investigating agent has further advised me that, based upon that agent's training and experience, one way to identify coconspirators is to obtain subscriber information for calls made to and from the SUBJECT TELEPHONES, and then conduct an investigation concerning those names, addresses and the accounts they use to pay for telephone service. Using subscriber information, law enforcement agents could then conduct surveillance at the addresses and determine if criminal activity was occurring there, which in turn could result in the identification of additional coconspirators and possible narcotics storage locations.  Likewise, the investigating agent has advised me that, based upon that agent's training and experience, prospective cell-site information can be used to aid agents in surveilling targets as they move from one location to another and identify the location of coconspirators and stash houses.  Likewise, historical cell-site information can be used to identify co-conspirators' residences, meeting places and stash houses.

53.   The government submits that the foregoing also constitutes specific and articulable facts showing that there are reasonable grounds to believe that the following information is relevant and material to an ongoing criminal investigation of the specified offenses:

a.    subscriber information pertaining to telephone numbers identified through the pen register and trap and trace device, to be limited to the names and addresses, whether listed or unlisted, length of service, periods of telephone activation and means of payment for all dialing, routing, addressing, or signaling information captured by the pen register on the SUBJECT TELEPHONES and for dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication transmitted to the SUBJECT TELEPHONES as captured by the trap and trace device on the SUBJECT TELEPHONES ("SPECIFIED SUBSCRIBER INFORMATION");[3] and

b.    recorded information that identifies the antenna towers that received transmissions from the SUBJECT TELEPHONES at the beginning and the end of calls or text message transmission made or received by the SUBJECT TELEPHONES, including information on what portions of those towers received the transmissions ("HISTORICAL CELL-SITE INFORMATION"), for the period from October 1, 2010 until 11:00 a.m. Eastern Time on the date the Court issues its Orders.

---

[3] The SPECIFIED SUBSCRIBER INFORMATION therefore includes records that would also be subject to disclosure by subpoena under 18 U.S.C. § 2703(c)(2)(A), (B), (D), (E) and (F), but excludes "local and long distance telephone connection records, or records of session times and durations" as described in 18 U.S.C. § 2703(c)(2)(C).

23

III. <u>Relief Requested</u>

54.  Based upon the foregoing, the government requests that the Court issue the enclosed proposed Orders that provide:

a.  pursuant to 18 U.S.C. §§ 3122 and 3123, authorization for the installation and use of pen registers to record or decode dialing, routing, addressing, or signaling information — excluding the decoding of post-cut-through dialed digits ("PCTDD")[4] — transmitted from the SUBJECT TELEPHONES, to record the date and time of such dialings or transmissions, and to record the length of time the telephone receiver in question is "off the hook" for incoming or outgoing calls for a period of 60 days;

b.  pursuant to 18 U.S.C. §§ 3122 and 3123, authorization for installation and use of trap and trace devices on the SUBJECT TELEPHONES to capture and record the incoming electronic or other impulses which identify the originating numbers or other dialing, routing, addressing, or signaling

---

[4] PCTDD "are digits that are dialed from a telephone after a call is connected or 'cut-through.'"  <u>In re Application</u>, 632 F. Supp. at 203 n.1.  Pursuant to the proposed Order to Service Provider, if possible, the provider will forward only pre-cut-through-dialed digits to the investigative agency.  If the provider's technical capabilities require it to forward all dialed digits including PCTDD, however, the investigative agency will only decode and forward to the assigned special agents the numbers that are dialed before the call is cut through.  Thus no PCTDD will be decoded or accessed by anyone.  <u>See id.</u> at 204 n.3 ("It is irrelevant that the provider will forward PCTDD to the Government and that the Government will therefore be able, if it violates the court order, to record and decode it.").

information reasonably likely to identify the sources of wire or electronic communications and to record the date, time and duration of calls created by such incoming impulses, for a period of 60 days, and that the tracing operations be without geographical limits;

        c.    pursuant to 18 U.S.C. § 3123(b)(1)(C), authorization for the requested installation and use of pen registers and a trap and trace devices to include authorization for any changed telephone numbers assigned to instruments bearing the same IMSIs as the SUBJECT TELEPHONES, or any changed IMSIs subsequently assigned to the same telephone numbers as the SUBJECT TELEPHONES, or any additional changed telephone numbers and/or IMSIs, whether the changes occur consecutively or simultaneously, listed to the same subscribers and account numbers as the SUBJECT TELEPHONES;

        d.    pursuant to 18 U.S.C. § 2703(c)(1) and (d), a directive to the service providers, and to any other local, long distance, or wireless carriers servicing the SUBJECT TELEPHONES or a telephone that communicates with the SUBJECT TELEPHONES to supply the SPECIFIED SUBSCRIBER INFORMATION, upon oral or written request by special agents of the investigative agency, for a period of 60 days;

        e.    pursuant to 18 U.S.C. § 2703(c)(1) and (d), a directive to the service providers to within seven days supply

HISTORICAL CELL-SITE INFORMATION for the period from October 1, 2010 until 11:00 a.m. Eastern Time on the date of the proposed Orders; and

        f.    pursuant to 18 U.S.C. §§ 3122 and 3123, the Stored Communications Act, 18 U.S.C. §§ 2701 et seq., and Fed. R. Crim. P. 41, a directive to the service providers to supply PROSPECTIVE CELL-SITE INFORMATION for a period of 30 days.

55.   The government further requests that the Court direct the service providers, and any other person or entity providing wire or electronic communication service in the United States whose assistance is used to facilitate execution of the Order, to notify special agents of the investigative agency, upon oral or written request, of any and all changes (including additions, deletions, and transfers) in service regarding the SUBJECT TELEPHONES, including telephone numbers and subscriber information (published and non-published, and excepting call detail records as described in 18 U.S.C. § 2703(c)(2)(C)), associated with these service changes.

56.   The government further requests pursuant to 18 U.S.C. § 3123(a)(1) and (b)(2), the Court direct that the service providers and any other person or entity providing wire or electronic communication service in the United States whose assistance may facilitate execution of the Orders furnish the information, facilities, and technical assistance necessary to

accomplish unobtrusively the installation and use of the pen registers and trap and trace devices with compensation to be paid by the investigative agency for reasonable expenses directly incurred in providing such facilities and assistance.

57. The government further requests that the Orders direct the service providers, and any other person or entity providing wire or electronic communication service in the United States whose assistance is used to facilitate execution of the Order, to furnish the results of the pen register and trap and trace device installations to special agents of the investigative agency as soon as practicable, and on a continuing basis, 24 hours a day for the duration of the Order.

58. The government further requests that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the SUBJECT TELEPHONES outside of daytime hours.

59. The government further requests pursuant to 18 U.S.C. §§ 3123(d) and 2705(b), that the service providers, and any other person or entity whose assistance is used to facilitate execution of the Orders be ordered not to disclose to the listed subscribers of the telephones, or to any other person (a) the existence of the Order of Authorization; (b) the existence of the Order to Service Provider; (c) the existence of the pen register and trap and trace device; (d) the production of the HISTORICAL

27

and PROSPECTIVE CELL-SITE INFORMATION and (e) the production of the SPECIFIED SUBSCRIBER INFORMATION, to the listed subscribers for the SUBJECT TELEPHONES, the subscribers of the telephones initiating incoming calls to or receiving outgoing calls from the SUBJECT TELEPHONES, or to any other person, unless and until otherwise ordered by the Court. There is "reasonable cause to believe that providing immediate notification of the execution of the warrant may have an adverse result." 18 U.S.C. § 3103a(b)(1). Providing prior notice to the subscribers or users of the SUBJECT TELEPHONES would seriously jeopardize the ongoing investigation, as such a disclosure would give those persons an opportunity to destroy evidence, change patterns of behavior, change telephone numbers, notify confederates, or flee or continue their flight from prosecution.

60. Finally, the government requests that pursuant to 18 U.S.C. § 3103a(b) and Fed. R. Crim. P. 41(f)(3), the Court authorize notice to be delayed for a period of 30 days after the termination of the monitoring period authorized by the warrant or any extensions thereof.

61.   No prior request for the relief set forth herein
has been made except to the extent set forth above.   The
foregoing is affirmed under the penalties of perjury.   See 28
U.S.C. § 1746.

Dated:      Brooklyn, New York
            January 26, 2011

                                    _____
                                    Karin Orenstein
                                    Assistant United States Attorney
                                    (718) 254-6188

29

WMN:KKO
F. #2010R02094

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

 **MISC.** *11-053**

- - - - - - - - - - - - - - - - - - - x
                                       :
IN THE MATTER OF AN APPLICATION OF     :
THE UNITED STATES OF AMERICA FOR AN    :
ORDER AUTHORIZING (1) THE USE OF A     :     SEALED ORDER TO
PEN REGISTER AND A TRAP AND TRACE      :     <u>SERVICE PROVIDER</u>
DEVICE WITH PROSPECTIVE CELL-SITE      :
INFORMATION AND (2) THE RELEASE OF     :
HISTORICAL CELL-SITE AND SUBSCRIBER    :
INFORMATION FOR THE MOBILE TELEPHONE   :
ASSIGNED NUMBER (917) 864-7701         :
                                       :
- - - - - - - - - - - - - - - - - - - x

WHEREAS this Court has, upon the application of the

United States of America, entered an Order authorizing a pen

register and trap and trace device with prospective cell-site

information and the release of historical and cell-site

information, the Court hereby ORDERS:

1. Pursuant to 18 U.S.C. § 3123, special agents of the

Drug Enforcement Administration (the "investigative agency") may

install, or cause to be installed, and use a pen register to record

or decode dialing, routing, addressing, or signaling information

transmitted from (917) 864-7701, a mobile telephone serviced by

Verizon Wireless, with Electronic Serial Number ("ESN")

A000001C1ACF15 subscribed to by STEVEN PUNTURIERI, 14 Dorval

Avenue, Staten Island, New York (the "SUBJECT TELEPHONE") to record

the date and time of such dialings or transmissions, and to record

the length of time the telephone receiver in question is "off the

hook" for incoming or outgoing calls for a period of 60 days, beginning at any time within 14 days from the date of this Order.

2. To the extent possible in light of the service provider's technical capabilities, the service provider shall forward to the investigative agency only those digits dialed before a call is cut-through. However, to the extent that the service provider is unable to exclude post-cut-through dialed digits, the service provider shall forward all dialed digits to the investigative agency.

3. Pursuant to 18 U.S.C. § 3123, special agents of the investigative agency may install, or cause to be installed, and use a trap and trace device on the SUBJECT TELEPHONE to capture and record the incoming electronic or other impulses which identify the originating number, or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication, and to record the date, time, and duration of calls created by such incoming impulses, for a period of 60 days, beginning at any time within 14 days from the date of this Order, and the tracing operations shall be without geographical limits.

4. Pursuant to 18 U.S.C. § 2703(c)(1) and (d), for a period of 60 days, beginning at any time within 14 days from the date of this Order, the service provider and any local, long distance or wireless provider, or person or entity providing wire

2

or electronic communication service in the United States or any other person or entity servicing either the SUBJECT TELEPHONE or a telephone that communicates with the SUBJECT TELEPHONE, shall supply subscriber information pertaining to telephone numbers identified through the pen register and trap and trace device, to be limited to the names and addresses, whether listed or unlisted, length of service, periods of telephone activation and means of payment for all dialing, routing, addressing, or signaling information captured by the pen register on the SUBJECT TELEPHONE and for dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication transmitted to the SUBJECT TELEPHONE as captured by the trap and trace device on the SUBJECT TELEPHONE ("SPECIFIED SUBSCRIBER INFORMATION"),[1] upon oral or written request by special agents of the investigative agency.

5.    Pursuant to 18 U.S.C. § 2703(c)(1) and (d), within seven days the service provider shall supply recorded information identifying the antenna tower that received transmissions from the SUBJECT TELEPHONE at the beginning and the end of calls or text message transmission made or received by the SUBJECT TELEPHONE,

---

[1] The SPECIFIED SUBSCRIBER INFORMATION includes records that would also be subject to disclosure by subpoena under 18 U.S.C. § 2703(c)(2)(A), (B), (D), (E) and (F), but excludes "local and long distance telephone connection records, or records of session times and durations" as described in 18 U.S.C. § 2703(c)(2)(C).

including information on what portion of that tower received the transmission ("HISTORICAL CELL-SITE INFORMATION"), for the period from October 1, 2010 until 11:00 a.m. Eastern Time on the date of this Order.

6.   Pursuant to 18 U.S.C. §§ 3122 and 3123, the Stored Communications Act, 18 U.S.C. §§ 2701 et seq., and Fed. R. Crim. P. 41, for a period of 30 days, beginning at any time within 14 days from the date of this Order, the service provider shall supply information that identifies the antenna tower receiving transmissions from the SUBJECT TELEPHONE at the beginning and the end of a call or text message transmission made or received by the SUBJECT TELEPHONE, including information on what portion of that tower is receiving the transmission ("PROSPECTIVE CELL-SITE INFORMATION").

7.   Pursuant to 18 U.S.C. § 3123(b)(1)(C), the authorization for the installation and use of a pen register and a trap and trace device applies not only to the telephone number listed above for the SUBJECT TELEPHONE, but also to any changed telephone number assigned to an instrument bearing the same IMSI as the SUBJECT TELEPHONE, or any changed IMSI subsequently assigned to the same telephone number as the SUBJECT TELEPHONE, or any additional changed telephone number and/or IMSI, whether the

4

changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the SUBJECT TELEPHONE.

8.   The service provider and any other person or entity providing wire or electronic communication service in the United States whose assistance is used to facilitate execution of the Order shall notify special agents of the investigative agency, upon oral or written request, of any and all changes (including additions, deletions, and transfers) in service regarding the SUBJECT TELEPHONE, including telephone numbers and subscriber information (published and non-published, and excepting call detail records, as described in 18 U.S.C. § 2703(c)(2)(C)), associated with these service changes.

9.   Pursuant to 18 U.S.C. § 3123(a)(1) and (b)(2), and 18 U.S.C. § 2703(c) and (d), upon service of this Order upon it the service provider and any other person or entity providing wire or electronic communication service in the United States whose assistance is used to facilitate execution of the Order shall furnish special agents of the investigative agency forthwith all information, including but not limited to telephone subscriber information, facilities, and technical assistance necessary to accomplish the installation and use of the pen register and trap and trace device unobtrusively and with minimum interference.

5

10.   The service provider and any other person or entity providing wire or electronic communication service in the United States whose assistance is used to facilitate execution of the Order furnish the results of the pen register and trap and trace device installations to special agents of the investigative agency as soon as practicable, and on a continuing basis, 24 hours a day for the duration of the Order.

11.   The service provider and any other person or entity that provides technical assistance in executing this Order shall be compensated by the investigative agency for reasonable expenses directly incurred in providing such assistance.

12.   This Order shall be sealed until otherwise ordered by the Court, except that copies may be retained by the United States Attorney's Office, the investigative agency, the service provider and any other person or entity whose assistance is used to execute this Order.

13.   Unless and until otherwise ordered by the Court, the service provider and its representatives, agents and employees, and any other person or entity providing technical assistance in executing this Order shall not disclose until further notice in any manner, directly or indirectly, by any action or inaction: (a) the existence of the Order of Authorization; (b) the existence of the Order to Service Provider; (c) the existence of the pen register and trap and trace device; (d) the production of the HISTORICAL or

6

PROSPECTIVE CELL-SITE INFORMATION and (e) the production of the SPECIFIED SUBSCRIBER INFORMATION, to the listed subscriber for the SUBJECT TELEPHONE, the subscribers of the telephones initiating incoming calls to or receiving outgoing calls from the SUBJECT TELEPHONE, or to any other person.

Dated:      Brooklyn, New York
            January 26, 2011

_Joanne L. Mann_
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

7

WMN:KKO
F. #2010R02094

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

 **MISC.**

**11-053**

- - - - - - - - - - - - - - - - - - - x
                                       :
IN THE MATTER OF AN APPLICATION OF     :
THE UNITED STATES OF AMERICA FOR AN    :
ORDER AUTHORIZING (1) THE USE OF A     :
PEN REGISTER AND A TRAP AND TRACE      :     SEALED ORDER TO
DEVICE WITH PROSPECTIVE CELL-SITE      :     SERVICE PROVIDER
INFORMATION AND (2) THE RELEASE OF     :
HISTORICAL CELL-SITE AND SUBSCRIBER    :
INFORMATION FOR THE MOBILE TELEPHONE   :
ASSIGNED NUMBER (347) 601-5083         :
                                       :
- - - - - - - - - - - - - - - - - - - x

WHEREAS this Court has, upon the application of the

United States of America, entered an Order authorizing a pen

register and trap and trace device with prospective cell-site

information and the release of historical and cell-site

information, the Court hereby ORDERS:

1.    Pursuant to 18 U.S.C. § 3123, special agents of the

Drug Enforcement Administration (the "investigative agency") may

install, or cause to be installed, and use a pen register to record

or decode dialing, routing, addressing, or signaling information

transmitted from (347) 601-5083, a mobile telephone serviced by

AT&T Wireless, with International Mobile Subscriber Identity

("IMSI") 310410356751754 subscribed to by JAMES WRENN, 83 Glover

Avenue, Staten Island, New York (the "SUBJECT TELEPHONE") to record

the date and time of such dialings or transmissions, and to record

the length of time the telephone receiver in question is "off the

hook" for incoming or outgoing calls for a period of 60 days, beginning at any time within 14 days from the date of this Order.

2.   To the extent possible in light of the service provider's technical capabilities, the service provider shall forward to the investigative agency only those digits dialed before a call is cut-through.   However, to the extent that the service provider is unable to exclude post-cut-through dialed digits, the service provider shall forward all dialed digits to the investigative agency.

3.   Pursuant to 18 U.S.C. § 3123, special agents of the investigative agency may install, or cause to be installed, and use a trap and trace device on the SUBJECT TELEPHONE to capture and record the incoming electronic or other impulses which identify the originating number, or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication, and to record the date, time, and duration of calls created by such incoming impulses, for a period of 60 days, beginning at any time within 14 days from the date of this Order, and the tracing operations shall be without geographical limits.

4.   Pursuant to 18 U.S.C. § 2703(c)(1) and (d), for a period of 60 days, beginning at any time within 14 days from the date of this Order, the service provider and any local, long distance or wireless provider, or person or entity providing wire

2

or electronic communication service in the United States or any other person or entity servicing either the SUBJECT TELEPHONE or a telephone that communicates with the SUBJECT TELEPHONE, shall supply subscriber information pertaining to telephone numbers identified through the pen register and trap and trace device, to be limited to the names and addresses, whether listed or unlisted, length of service, periods of telephone activation and means of payment for all dialing, routing, addressing, or signaling information captured by the pen register on the SUBJECT TELEPHONE and for dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication transmitted to the SUBJECT TELEPHONE as captured by the trap and trace device on the SUBJECT TELEPHONE ("SPECIFIED SUBSCRIBER INFORMATION"),[1] upon oral or written request by special agents of the investigative agency.

     5.    Pursuant to 18 U.S.C. § 2703(c)(1) and (d), within seven days the service provider shall supply recorded information identifying the antenna tower that received transmissions from the SUBJECT TELEPHONE at the beginning and the end of calls or text message transmission made or received by the SUBJECT TELEPHONE,

---

[1] The SPECIFIED SUBSCRIBER INFORMATION includes records that would also be subject to disclosure by subpoena under 18 U.S.C. § 2703(c)(2)(A), (B), (D), (E) and (F), but excludes "local and long distance telephone connection records, or records of session times and durations" as described in 18 U.S.C. § 2703(c)(2)(C).

including information on what portion of that tower received the transmission ("HISTORICAL CELL-SITE INFORMATION"), for the period from October 1, 2010 until 11:00 a.m. Eastern Time on the date of this Order.

6.   Pursuant to 18 U.S.C. §§ 3122 and 3123, the Stored Communications Act, 18 U.S.C. §§ 2701 et seq., and Fed. R. Crim. P. 41, for a period of 30 days, beginning at any time within 14 days from the date of this Order, the service provider shall supply information that identifies the antenna tower receiving transmissions from the SUBJECT TELEPHONE at the beginning and the end of a call or text message transmission made or received by the SUBJECT TELEPHONE, including information on what portion of that tower is receiving the transmission ("PROSPECTIVE CELL-SITE INFORMATION").

7.   Pursuant to 18 U.S.C. § 3123(b)(1)(C), the authorization for the installation and use of a pen register and a trap and trace device applies not only to the telephone number listed above for the SUBJECT TELEPHONE, but also to any changed telephone number assigned to an instrument bearing the same IMSI as the SUBJECT TELEPHONE, or any changed IMSI subsequently assigned to the same telephone number as the SUBJECT TELEPHONE, or any additional changed telephone number and/or IMSI, whether the

4

changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the SUBJECT TELEPHONE.

8.    The service provider and any other person or entity providing wire or electronic communication service in the United States whose assistance is used to facilitate execution of the Order shall notify special agents of the investigative agency, upon oral or written request, of any and all changes (including additions, deletions, and transfers) in service regarding the SUBJECT TELEPHONE, including telephone numbers and subscriber information (published and non-published, and excepting call detail records, as described in 18 U.S.C. § 2703(c)(2)(C)), associated with these service changes.

9.    Pursuant to 18 U.S.C. § 3123(a)(1) and (b)(2), and 18 U.S.C. § 2703(c) and (d), upon service of this Order upon it the service provider and any other person or entity providing wire or electronic communication service in the United States whose assistance is used to facilitate execution of the Order shall furnish special agents of the investigative agency forthwith all information, including but not limited to telephone subscriber information, facilities, and technical assistance necessary to accomplish the installation and use of the pen register and trap and trace device unobtrusively and with minimum interference.

5

10. The service provider and any other person or entity providing wire or electronic communication service in the United States whose assistance is used to facilitate execution of the Order furnish the results of the pen register and trap and trace device installations to special agents of the investigative agency as soon as practicable, and on a continuing basis, 24 hours a day for the duration of the Order.

11. The service provider and any other person or entity that provides technical assistance in executing this Order shall be compensated by the investigative agency for reasonable expenses directly incurred in providing such assistance.

12. This Order shall be sealed until otherwise ordered by the Court, except that copies may be retained by the United States Attorney's Office, the investigative agency, the service provider and any other person or entity whose assistance is used to execute this Order.

13. Unless and until otherwise ordered by the Court, the service provider and its representatives, agents and employees, and any other person or entity providing technical assistance in executing this Order shall not disclose until further notice in any manner, directly or indirectly, by any action or inaction: (a) the existence of the Order of Authorization; (b) the existence of the Order to Service Provider; (c) the existence of the pen register and trap and trace device; (d) the production of the HISTORICAL or

6

PROSPECTIVE CELL-SITE INFORMATION and (e) the production of the SPECIFIED SUBSCRIBER INFORMATION, to the listed subscriber for the SUBJECT TELEPHONE, the subscribers of the telephones initiating incoming calls to or receiving outgoing calls from the SUBJECT TELEPHONE, or to any other person.

Dated:    Brooklyn, New York
          January 26, 2011

Coanne L. Mann
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

7

WMN:KKO
F. #2010R02094

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - 

IN THE MATTER OF AN APPLICATION OF        :
THE UNITED STATES OF AMERICA FOR AN       :
ORDER AUTHORIZING (1) THE USE OF A        :
PEN REGISTER AND A TRAP AND TRACE         :    SEALED ORDER
DEVICE WITH PROSPECTIVE CELL-SITE         :    OF AUTHORIZATION
INFORMATION AND (2) THE RELEASE OF        :
HISTORICAL CELL-SITE AND SUBSCRIBER       :
INFORMATION FOR MOBILE TELEPHONES         :
ASSIGNED NUMBERS (917) 559-1687,          :
(347) 601-5083 and (917) 864-7701         x

- - - - - - - - - - - - - - - - - -

Upon the application of the United States of America,

THE COURT HEREBY FINDS:

1.   Pursuant to 18 U.S.C. § 3123, the applicant has

certified that the information likely to be obtained by use of

pen registers and trap and trace devices on: (1) (917) 559-1687,

a mobile telephone serviced by T-MOBILE, USA, with International

Mobile Subscriber Identity ("IMSI") 310260250312721 subscribed to

by JAMES PASCALE, 68 Elder Avenue, Staten Island, New York (the

"PASCALE TELEPHONE"); (2) (347) 601-5083, a mobile telephone

serviced by AT&T Wireless, with IMSI 310410356751754 subscribed

to by JAMES WRENN, 83 Glover Avenue, Staten Island, New York (the

"WRENN TELEPHONE"); and (3) (917) 864-7701, a mobile telephone

serviced by Verizon Wireless, with Electronic Serial Number

("ESN") A000001C1ACF15 subscribed to by STEVEN PUNTURIERI, 14

Dorval Avenue, Staten Island, New York (the "PUNTURIERI

TELEPHONE"; collectively, the "SUBJECT TELEPHONES"), is relevant

to an ongoing criminal investigation being conducted by the Drug

Enforcement Administration (the "investigative agency") into

possible violations of federal criminal laws, including narcotics

offenses in violation of 21 U.S.C. §§ 841 and 846 by JAMES

PASCALE, JAMES WRENN, STEVEN PUNTURIERI and others (the

"specified offenses").

2.    Pursuant to 18 U.S.C. § 2703(c)(1) and (d), the

applicant has offered specific and articulable facts showing that

there are reasonable grounds to believe that the subscriber and

historical cell-site information specified below are relevant and

material to an ongoing criminal investigation of the specified

offenses.

3.    Pursuant to 18 U.S.C. §§ 3122 and 3123, the Stored

Communications Act, 18 U.S.C. §§ 2701 et seq., and Fed. R. Crim.

P. 41, the applicant has demonstrated that probable cause exists

to believe that the prospective cell-site information specified

below will constitute or lead to evidence of the specified

offenses, as well as the identification of individuals who are

engaged in the commission of these offenses.

NOW, THEREFORE, IT IS HEREBY ORDERED:

4.    Pursuant to 18 U.S.C. § 3123, special agents of

the investigative agency may install, or cause to be installed,

and use a pen register to record or decode dialing, routing,

addressing, or signaling information transmitted from each of the

SUBJECT TELEPHONES — excluding the decoding of post-cut-through dialed digits ("PCTDD")[1] — to record the date and time of such dialings or transmissions, and to record the length of time the telephone receiver in question is "off the hook". for incoming or outgoing calls for a period of 60 days, beginning at any time within 14 days from the date of this Order, and that the tracing operations be without geographical limits.

5.    Pursuant to 18 U.S.C. § 3123, special agents of the investigative agency may install, or cause to be installed, and use trap and trace devices on the SUBJECT TELEPHONES to capture and record the incoming electronic or other impulses which identify the originating numbers, or other dialing, routing, addressing, and signaling information reasonably likely to identify the sources of wire or electronic communications, and to record the date, time, and duration of calls created by such incoming impulses, for a period of 60 days, beginning at any time within 14 days from the date of this Order, and that the tracing operations be without geographical limits.

---

[1] PCTDD "are digits that are dialed from a telephone after a call is connected or 'cut-through.'" In re Application, 632 F. Supp. 2d 202, 203 n.1 (E.D.N.Y. 2008). Pursuant to the proposed Order to Service Provider, if possible, the provider will forward only pre-cut-through-dialed digits to the investigative agency. If the provider's technical capabilities require it to forward all dialed digits, including PCTDD, however, the investigative agency shall only decode and forward to the assigned special agents the numbers that are dialed before the call is cut through.

3

6. Pursuant to 18 U.S.C. § 2703(c)(1) and (d), for a period of 60 days, beginning at any time within 14 days from the date of this Order, the service providers and any other local, long distance or wireless carriers servicing the SUBJECT TELEPHONES shall supply subscriber information pertaining to telephone numbers identified through the pen registers and trap and trace devices, to be limited to the names and addresses, whether listed or unlisted, length of service, periods of telephone activation and means of payment for all dialing, routing, addressing, or signaling information captured by the pen registers on the SUBJECT TELEPHONES and for dialing, routing, addressing, or signaling information reasonably likely to identify the sources of wire or electronic communications transmitted to the SUBJECT TELEPHONES as captured by the trap and trace device on the SUBJECT TELEPHONES ("SPECIFIED SUBSCRIBER INFORMATION"),[2] upon oral or written request by special agents of the investigative agency.

7. Pursuant to 18 U.S.C. § 2703(c)(1) and (d), within seven days the service providers shall supply recorded information that identifies the antenna towers that received

_____

[2] The SPECIFIED SUBSCRIBER INFORMATION includes records that would also be subject to disclosure by subpoena under 18 U.S.C. § 2703(c)(2)(A), (B), (D), (E) and (F), but excludes "local and long distance telephone connection records, or records of session times and durations" as described in 18 U.S.C. § 2703(c)(2)(C).

4

transmissions from the SUBJECT TELEPHONES at the beginning and the end of calls or text message transmissions made or received by the SUBJECT TELEPHONES, including information on what portions of those towers received the transmissions ("HISTORICAL CELL-SITE INFORMATION"), for the period from October 1, 2010 until 11:00 a.m. Eastern Time on the date of this Order.

8.      Pursuant to 18 U.S.C. §§ 3122 and 3123, the Stored Communications Act, 18 U.S.C. §§ 2701 et seq., and Fed. R. Crim. P. 41, for a period of 30 days, beginning at any time within 14 days from the date of this Order, the service providers shall supply information identifying the antenna towers receiving transmissions from the SUBJECT TELEPHONES at the beginning and the end of calls or text message transmissions made or received by the SUBJECT TELEPHONES, including information on what portions of those towers are receiving the transmissions ("PROSPECTIVE CELL-SITE INFORMATION").

9.      This authorization for the installation and use of pen registers and trap and trace devices applies not only to the telephone numbers listed above for the SUBJECT TELEPHONES, but also to any changed telephone numbers assigned to an instruments bearing the same IMSIs as the SUBJECT TELEPHONES, or any changed IMSIs subsequently assigned to the same telephone numbers as the SUBJECT TELEPHONES, or any additional changed telephone numbers and/or IMSIs, whether the changes occur consecutively or

5

simultaneously, listed to the same subscriber and wireless telephone account number as the SUBJECT TELEPHONES.

10.   The service providers and any other person or entity providing wire or electronic communication service in the United States whose assistance is used to facilitate execution of the Order notify special agents of the investigative agency, upon oral or written request, of any and all changes in service regarding the SUBJECT TELEPHONES to include telephone numbers and subscriber information (published and non-published and excepting call detail records as described in 18 U.S.C. § 2703(c)(2)(C)) associated with these service changes.

11.   Pursuant to 18 U.S.C. § 3123(a)(1) and (b)(2) and 18 U.S.C. § 2703(c) and (d), the service providers and any other person or entity providing wire or electronic communication service in the United States whose assistance may facilitate execution of the Order shall furnish special agents of the investigative agency forthwith all information, including but not limited to telephone subscriber information, facilities, and technical assistance necessary to accomplish the installation and use of the pen register and trap and trace device unobtrusively and with minimum interference.

12.   The service providers and any other person or entity providing wire or electronic communication service in the United States whose assistance is used to facilitate execution of

6

the Order furnish the results of the pen register and trap and trace device installations to special agents of the investigative agency as soon as practicable, and on a continuing basis, 24 hours a day for the duration of the Order.

13.   The service providers and any other person or entity whose assistance is used to facilitate this Order be compensated by the investigative agency for reasonable expenses directly incurred in providing such assistance.

14.   The Court's Orders, the warrant and the application shall be sealed until further Order of the Court, except that copies of the warrant and the Court's Orders, in full or redacted form, may be maintained by the United States Attorney's Office, and may be served on law enforcement officers, and other government and contract personnel acting under the supervision of such law enforcement officers, and the service provider as necessary to effectuate the Court's Orders.

15.   Pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), service of notice may be delayed for a period of 30 days after the termination of the monitoring period authorized by the warrant or any extension thereof.

16.   The service providers, their affiliates, officers, employees, and agents not disclose the Court's Orders or the

7

underlying investigation, until notice is given as provided
above.

Dated:    Brooklyn, New York
          January 2⅙, 2011

_Coanne L. Mann_

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

8

WMN:KKO
F. #2010R02094

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - **MISC. 11-053**

IN THE MATTER OF AN APPLICATION OF   :
THE UNITED STATES OF AMERICA FOR AN
ORDER AUTHORIZING (1) THE USE OF A   :   SEALED ORDER TO
PEN REGISTER AND A TRAP AND TRACE   :   SERVICE PROVIDER
DEVICE WITH PROSPECTIVE CELL-SITE
INFORMATION AND (2) THE RELEASE OF   :
HISTORICAL CELL-SITE AND SUBSCRIBER
INFORMATION FOR MOBILE TELEPHONES   :
ASSIGNED NUMBER (917) 559-1687   :

                        :

- - - - - - - - - - - - - - - - - - - x

       **WHEREAS** this Court has, upon the application of the

United States of America, entered an Order authorizing a pen

register and trap and trace device with prospective cell-site

information and the release of historical and cell-site

information, the Court hereby ORDERS:

       1.    Pursuant to 18 U.S.C. § 3123, special agents of

the Drug Enforcement Administration (the "investigative agency")

may install, or cause to be installed, and use a pen register to

record or decode dialing, routing, addressing, or signaling

information transmitted from (917) 559-1687, a telephone issued

by T-MOBILE, USA (the "service provider"), with International

Mobile Subscriber Identity ("IMSI") 310260250312721 subscribed to

by JAMES PASCALE, 68 Elder Avenue, Staten Island, New York (the

"SUBJECT TELEPHONE") to record the date and time of such dialings

or transmissions, and to record the length of time the telephone

receiver in question is "off the hook" for incoming or outgoing

calls for a period of 60 days, beginning at any time within 14 days from the date of this Order.

2.   To the extent possible in light of the service provider's technical capabilities, the service provider shall forward to the investigative agency only those digits dialed before a call is cut-through.  However, to the extent that the service provider is unable to exclude post-cut-through dialed digits, the service provider shall forward all dialed digits to the investigative agency.

3.   Pursuant to 18 U.S.C. § 3123, special agents of the investigative agency may install, or cause to be installed, and use a trap and trace device on the SUBJECT TELEPHONE to capture and record the incoming electronic or other impulses which identify the originating number, or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication, and to record the date, time, and duration of calls created by such incoming impulses, for a period of 60 days, beginning at any time within 14 days from the date of this Order, and the tracing operations shall be without geographical limits.

4.   Pursuant to 18 U.S.C. § 2703(c)(1) and (d), for a period of 60 days, beginning at any time within 14 days from the date of this Order, the service provider and any local, long distance or wireless provider, or person or entity providing wire

2

or electronic communication service in the United States or any other person or entity servicing either the SUBJECT TELEPHONE or a telephone that communicates with the SUBJECT TELEPHONE, shall supply subscriber information pertaining to telephone numbers identified through the pen register and trap and trace device, to be limited to the names and addresses, whether listed or unlisted, length of service, periods of telephone activation and means of payment for all dialing, routing, addressing, or signaling information captured by the pen register on the SUBJECT TELEPHONE and for dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication transmitted to the SUBJECT TELEPHONE as captured by the trap and trace device on the SUBJECT TELEPHONE ("SPECIFIED SUBSCRIBER INFORMATION"),[3] upon oral or written request by special agents of the investigative agency.

5.    Pursuant to 18 U.S.C. § 2703(c)(1) and (d), within seven days the service provider shall supply recorded information identifying the antenna tower that received transmissions from the SUBJECT TELEPHONE at the beginning and the end of calls or text message transmission made or received by the SUBJECT

---

[3] The SPECIFIED SUBSCRIBER INFORMATION includes records that would also be subject to disclosure by subpoena under 18 U.S.C. § 2703(c)(2)(A), (B), (D), (E) and (F), but excludes "local and long distance telephone connection records, or records of session times and durations" as described in 18 U.S.C. § 2703(c)(2)(C).

3

TELEPHONE, including information on what portion of that tower received the transmission ("HISTORICAL CELL-SITE INFORMATION"), for the period from October 1, 2010 until 11:00 a.m. Eastern Time on the date of this Order.

6.     Pursuant to 18 U.S.C. §§ 3122 and 3123, the Stored Communications Act, 18 U.S.C. §§ 2701 et seq., and Fed. R. Crim. P. 41, for a period of 30 days, beginning at any time within 14 days from the date of this Order, the service provider shall supply information that identifies the antenna tower receiving transmissions from the SUBJECT TELEPHONE at the beginning and the end of a call or text message transmission made or received by the SUBJECT TELEPHONE, including information on what portion of that tower is receiving the transmission ("PROSPECTIVE CELL-SITE INFORMATION").

7.     Pursuant to 18 U.S.C. § 3123(b)(1)(C), the authorization for the installation and use of a pen register and a trap and trace device applies not only to the telephone number listed above for the SUBJECT TELEPHONE, but also to any changed telephone number assigned to an instrument bearing the same IMSI as the SUBJECT TELEPHONE, or any changed IMSI subsequently assigned to the same telephone number as the SUBJECT TELEPHONE, or any additional changed telephone number and/or IMSI, whether the changes occur consecutively or simultaneously, listed to the

4

same subscriber and wireless telephone account number as the
SUBJECT TELEPHONE.

8. The service provider and any other person or
entity providing wire or electronic communication service in the
United States whose assistance is used to facilitate execution of
the Order shall notify special agents of the investigative
agency, upon oral or written request, of any and all changes
(including additions, deletions, and transfers) in service
regarding the SUBJECT TELEPHONE, including telephone numbers and
subscriber information (published and non-published, and
excepting call detail records, as described in 18 U.S.C.
§ 2703(c)(2)(C)), associated with these service changes.

9. Pursuant to 18 U.S.C. § 3123(a)(1) and (b)(2), and
18 U.S.C. § 2703(c) and (d), upon service of this Order upon it
the service provider and any other person or entity providing
wire or electronic communication service in the United States
whose assistance is used to facilitate execution of the Order
shall furnish special agents of the investigative agency
forthwith all information, including but not limited to telephone
subscriber information, facilities, and technical assistance
necessary to accomplish the installation and use of the pen
register and trap and trace device unobtrusively and with minimum
interference.

5

10. The service provider and any other person or entity providing wire or electronic communication service in the United States whose assistance is used to facilitate execution of the Order furnish the results of the pen register and trap and trace device installations to special agents of the investigative agency as soon as practicable, and on a continuing basis, 24 hours a day for the duration of the Order.

11. The service provider and any other person or entity that provides technical assistance in executing this Order shall be compensated by the investigative agency for reasonable expenses directly incurred in providing such assistance.

12. This Order shall be sealed until otherwise ordered by the Court, except that copies may be retained by the United States Attorney's Office, the investigative agency, the service provider and any other person or entity whose assistance is used to execute this Order.

13. Unless and until otherwise ordered by the Court, the service provider and its representatives, agents and employees, and any other person or entity providing technical assistance in executing this Order shall not disclose until further notice in any manner, directly or indirectly, by any action or inaction: (a) the existence of the Order of Authorization; (b) the existence of the Order to Service Provider; (c) the existence of the pen register and trap and

6

trace device; (d) the production of the HISTORICAL or PROSPECTIVE CELL-SITE INFORMATION and (e) the production of the SPECIFIED SUBSCRIBER INFORMATION, to the listed subscriber for the SUBJECT TELEPHONE, the subscribers of the telephones initiating incoming calls to or receiving outgoing calls from the SUBJECT TELEPHONE, or to any other person.

Dated:    Brooklyn, New York
          January 26, 2011

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

7